IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-20529
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

v.

BERNARD ANTHONY DALE,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Texas
(95-CR-303)
_____
July 21, 1997
Before KING, DAVIS, and DeMOSS, Circuit Judges.

PER CURIAM:[*]

The government appeals from the district court's order

suppressing evidence seized from Bernard Anthony Dale at the

Dallas-Fort Worth airport and from Dale's Jeep during a traffic

stop.  We vacate the district court's order insofar as it deals

with that evidence and remand the case to the district court.

I. BACKGROUND

---

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

*A. Procedural History*

Bernard Anthony Dale was indicted for one count of conspiracy and twenty-five counts of possession with intent to distribute cocaine. Dale filed motions to suppress evidence seized from his person at the Dallas-Fort Worth Airport ("DFW"), evidence seized from his Jeep, and evidence seized from three other locations. The district court held a suppression hearing on May 23, 1996. On June 10, 1996, the district court made a preliminary ruling on the motions to suppress from the bench. Based on this preliminary information, the government informed the district court that it would seek to appeal the suppression order. The government moved to stay the trial pending the appeal of the suppression order, but the district court denied the motion. By the same order, the district court granted all of Dale's motions to suppress. On the same day, this court stayed the trial schedule pending the outcome of the appeal.

On June 17, 1996, the district court entered a more detailed order granting the motions to suppress. The district court suppressed the evidence seized from Dale at DFW and the evidence seized from Dale's Jeep, as well as evidence seized at the three other locations at issue. The government filed a notice of appeal pursuant to 18 U.S.C. § 3731 and 28 U.S.C. § 1291. Because the government only briefed issues relating to evidence seized from Dale at DFW and evidence seized from Dale's Jeep, we

2

do not address the suppression of evidence seized from the three other locations in this appeal.

*B. Statement of Facts*

*1. The Airport Stop at DFW*

At the suppression hearing, Officer Gerald Beall testified that he had received a telephone call from Special Agent Bryan Chambers of the Drug Enforcement Administration ("DEA") in Memphis, Tennessee. According to Beall, Chambers informed him that two black males who were acting extremely nervous had used cash to purchase one-way tickets from Memphis to Houston, with a change in Dallas. Accompanied by two fellow officers, Beall, a task force officer assigned to DFW, met the arriving flight.

Beall testified that he saw two men who fit Special Agent Chambers' description among the passengers deplaning. They appeared to be very nervous and scanned the crowd as they walked, checking behind them as well, as if to make sure they were not being followed. Beall approached the men, identified himself, and asked if he could see their airplane tickets. Both men had cash one-way tickets. Beall then asked for identification so he could check it against the tickets. The names on both tickets matched the driver's licenses produced by Dale and his traveling companion, Leon McGrew.

When Beall questioned Dale about the purpose of his trip, Dale said that they had gone to Knoxville to look for a beauty

3

shop to purchase. Dale also told the officers that he had met a friend named Vanessa who drove them back to Memphis. According to Beall, Dale was unable to give him Vanessa's last name, telephone number, or address. Dale was also unable to provide names, addresses, and phone numbers of other people to whom he had talked. Beall concluded that Dale's travel was not legitimate because he was evasive in his answers and he shifted his weight back and forth from one foot to the other.

Officer Beall then asked Dale if he was carrying anything unusual, such as illegal narcotics, large sums of money, or any type of contraband. After receiving a negative response, Beall asked permission to search Dale's carry-on bag, and Dale consented. Beall discovered nothing incriminating. At that time, Beall noticed a flat bulge in Dale's left pocket and asked what it was. Dale told Beall that he was carrying a little money and produced it for Beall's inspection. Beall noticed that the money was folded and held together by a rubber band and concluded that this manner of carrying money was suspicious because drug dealers often carry their money in this way.

Beall asked Dale if he was carrying any other money, and Dale said that he was carrying approximately $35,000. Upon request, Dale produced the money from his hip pocket. When Beall inquired about the source of the money, Dale told him it was proceeds from his beauty shop. When Beall attempted to ask about the shop, however, Dale changed his answer and said he had won

4

the money gambling on a football game.  Beall concluded that these stories were inconsistent and decided to have the money tested by a "drug dog."  At that point, Beall told Dale that he was not under arrest and that he was free to leave but that Beall wanted to take the money to the task force office to determine its origin and its intended use.  Beall gave Dale the option of accompanying him to the task force office or proceeding to Houston, where he would be notified of the results.  Dale chose to accompany Beall to the drug task force office.  As they drove to the office, Dale told Beall that he had borrowed the money from NationsBank and from a federal credit union in Galveston. After the money was placed in a locker, a "drug dog" was brought in to sniff for the presence of drugs on the money.  The dog alerted on the locker that contained the money.  At that point, Beall gave Dale a receipt for the money and returned him to the terminal.

   *2. The Search of Dale's Jeep*

   Galveston county narcotics officer Hugh Hawkins testified that he participated in the investigation of Dale by conducting surveillance at Dale's house in Texas City.  On September 18, 1995, police officers at the house noticed that Dale was loading boxes and trash bags into his Jeep.  Hawkins was familiar with Dale and the possibility that he was engaged in drug trafficking and had been told by a confidential informant that Dale

5

transported drugs in U-Haul boxes after renting U-Haul vehicles. The officers began pursuing Dale when he drove away from his house, and Dale ran a red light, in an attempt either to elude the officers or to ascertain if he was being followed. Dale was then stopped for the traffic violation. When Hawkins asked Dale where he was going, Dale said that his attorney had advised him not to talk to or cooperate in any way with law enforcement. Hawkins then asked Dale if the officers could search the vehicle for narcotics, and Dale repeated the advice of his attorney.[1]

Hawkins arrested Dale for the traffic violation and called a canine unit to have a dog sniff the Jeep for the presence of narcotics. The dog allegedly alerted by "sitting down." After this "sitting" alert, the officers had the Jeep towed to the police station to inventory the contents. At the station, the officers brought in a second canine unit, and the dog allegedly alerted to the tires and the back left corner panel of the vehicle. The officers obtained a search warrant that authorized them to search the Jeep for any violation of the Texas Health and Safety Code Section 481, the Texas Controlled Substances Act. The tires were then removed and deflated, but nothing was found in them. The officers seized fabric softener sheets, sandwich-size ziplock bags, personal papers, phone bills, and photographs

---

[1]Dale later told the officers that he had been on his way to the dump to discard the boxes and bags. Officer Hawkins conceded at the hearing that Dale was heading in the direction of the dump at the time he was stopped.

from the Jeep.  Hawkins testified that a confidential informant
had informed him that Dale used fabric softener sheets to mask
the scent of drugs.  Hawkins also testified that drug dealers
commonly use ziplock bags to package smaller quantities of drugs
and that the papers, phone bills, and photographs were relevant
evidence because they connected other members of the conspiracy.

## II. DISCUSSION

In an appeal from the district court's ruling on a motion to
suppress, we review factual findings in support of the ruling
under the clearly erroneous standard and legal conclusions de
novo.  United States v. Seals, 987 F.2d 1102, 1106 (5th Cir.),
cert. denied, 510 U.S. 853 (1993).  We view the evidence in the
light most favorable to the party who prevailed in the district
court.  United States v. Cardenas, 9 F.3d 1139, 1147 (5th Cir.
1993), cert. denied, 511 U.S. 1134 (1994).

In United States v. Berry, 670 F.2d 583 (5th Cir. 1982),
this court discussed the Fourth Amendment ramifications of three
levels of contact between police officers and citizens -- mere
communications, brief seizures, and full-scale arrests.  Id. at
591.  If the contact rises only to the level of "mere
communication" involving neither coercion nor detention, the
Fourth Amendment is not implicated.  Id.; United States v.
Bradley, 923 F.2d 362, 364 (5th Cir. 1991).  A brief seizure must
be supported by reasonable suspicion, and a full-scale arrest

7

must be supported by probable cause. Berry, 670 F.2d at 591.

The dividing line between a mere communication and a seizure is

whether "in view of all the circumstances surrounding the

incident, a reasonable person would have believed that he was not

free to leave." Id. (citing United States v. Mendenhall, 446

U.S. 544, 554 (1980)).

A. *The Airport Stop at DFW*

In suppressing the evidence seized at DFW, the district

court stated that the interaction between Beall and Dale was more

than a "mere communication." The court noted that the conduct

observed by Chambers and Beall is conduct that ordinary, law-

abiding persons engage in. The court also observed that "the

entire currency system is tainted with money that has been used

in the illegal drug business."[2] To invalidate the search, the

court focused on the fact that no contraband was discovered. The

court stated that "[a]t the time the currency was seized, there

were no articulable facts upon which officer Beall could rely

showing probable cause that the currency were the proceeds of

illegal activity." Instead, the court found that Beall's

---

[2]At a later point, the district court stated: "The drug-sniffing dog did not confirm the source of the currency, just the route that it had taken to get into the hands of the defendant. If this is the way of the law, drug-sniffing dogs should be taken to the banks in the United States of America to determine if probable cause exists to arrest the bank tellers."

suspicions were based on "his personal biases and prejudices." The court concluded that Beall's suspicions never rose to the level of articulable facts, and thus "[t]he seizure of the currency was unlawful when it occurred because there is no evidence that its source was drug related and the testimony of the drug dog is not admissible."

On appeal, the government argues that Beall properly obtained the evidence at DFW. The government contends that the initial encounter was a mere communication, that Beall had a reasonable suspicion that the money was the proceeds of illegal drug activity, justifying taking the money to have it tested, and that once the dog alerted on the cash in the locker, Beall had probable cause to believe that the money was the proceeds of illegal drug activity, and thus was justified in seizing the money.

Dale argues that the officers detained him when they pulled him aside to question him, and that the detention was not supported by reasonable suspicion. Furthermore, the officers' seizure of Dale's money so they could test it constituted a custodial arrest requiring probable cause, which the officers lacked at that time.

Even when they have no basis for suspecting a particular individual, law enforcement officers do not violate the Fourth Amendment by stopping a person at an airport or bus station, asking to see that person's ticket and identification, and

9

requesting consent to search his luggage, as long as they do not give the impression that compliance is required. United States v. Cooper, 43 F.3d 140, 145 (5th Cir. 1995); United States v. Galberth, 846 F.2d 983, 989-90 (5th Cir.), cert. denied, 488 U.S. 865 (1988). In Galberth, this court held that an encounter at an airport between an officer and the defendant did not constitute a seizure where the questions were asked in a public part of the airport, the officer did not resort to trickery or coercion, the defendant was not led to believe that she could not leave if she wished, and the encounter was limited in scope. Galberth, 846 F.2d at 989-90. Likewise, in this case, Beall questioned Dale in a public part of the airport and did not demonstrate any coercion by his words or conduct. Dale voluntarily agreed to let Beall search his carry-on bag and voluntarily agreed to show Beall the money he was carrying. Up until the time that Beall told Dale he wanted to take the money to the task force office, there was no reason for Dale to feel that he was not free to leave if he wished. The district court clearly erred in finding that the initial contact between Dale and Beall was more than a "mere communication."

Beall's decision to take the money to be tested constituted a brief detention requiring reasonable suspicion. That suspicion must be based on "specific and articulable facts which, taken together with rational inferences from those facts, would warrant a person of reasonable caution in the belief that the intrusion

10

was appropriate." United States v. Butler, 988 F.2d 537, 541 (5th Cir.), cert. denied, 510 U.S. 956 (1993). The district court's determination as to whether the officer had sufficient facts to satisfy the reasonable suspicion requirement is reviewed de novo. Ornelas v. United States, 116 S. Ct. 1657, 1663 (1996).

Although reasonable suspicion must be based on the "specific and articulable facts" of the individual situation with which the officers are confronted, Fifth Circuit precedent illustrates some of the factors this court has taken into consideration to find that officers had reasonable suspicion to detain someone. In Berry, this court held that there was reasonable suspicion when (1) the defendant arrived from a drug source city, (2) the defendant seemed to be nervous, (3) he traveled under an alias, (4) he tried to leave the airport by means of public transportation, and (5) he attempted to hide the fact that he was traveling with another person. Id. at 603. In United States v. Gonzales, 842 F.2d 748 (5th Cir. 1988), reasonable suspicion was found where (1) the defendant arrived from a source city, (2) the defendant appeared to be nervous and watchful, (3) the defendant carried only a small carry-on bag, (4) the defendant dressed "loudly", (5) the defendant lacked identification, and (6) the defendant tried to deceive the officers as to the length of her stay in Dallas. Id. at 753.

The facts available to Beall when he decided to detain the money are as follows: (1) Dale and McGrew had purchased one-way

11

tickets from Memphis to Houston with cash, (2) Houston is a source city for drugs, (3) the men appeared extremely nervous, (4) Dale was unable to tell Beall the names, addresses, or phone numbers of people he had met with in Knoxville, (4) Dale was unable to tell Beall the last name, address, or phone number of his friend Vanessa in Memphis, (5) Dale was carrying $35,000 in cash secured by rubber bands, (6) Dale lied to Beall when asked if he was carrying large amounts of money, and (7) Dale gave conflicting explanations for the source of the money.

In this case, Beall possessed sufficient articulable facts to constitute reasonable suspicion. While it may be that any one of the facts was not by itself proof of illegal conduct, taken together they amount to reasonable suspicion. See United States v. Sokolow, 490 U.S. 1, 9 (1989).

Once the dog alerted on the locker that contained the money, Dale was given a receipt for the money and returned to the terminal. Beall needed probable cause to believe that the money was the proceeds of illegal drug activity to seize Dale's money. United States v. Place, 462 U.S. 696, 708-09 (1983). "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." United States v. Mendez, 27 F.3d 126, 129 (5th Cir. 1994). A probable cause determination is reviewed de novo. Id. at 130.

In Mendez, the defendant was observed in the airport in Houston, a drug source city, preparing to fly to New York, a drug

12

demand city.  Id at 127.  He checked a large locked suitcase and proceeded to the gate.  Id. at 128.  Police officers learned from the ticket agent that Mendez had purchased a one-way ticket that day to fly the following day but was attempting to fly out a day early.  A canine unit went to the baggage handling area, where the dog alerted on Mendez's bag.  Officers then boarded the plane to talk to Mendez.  He showed them his ticket but claimed he did not have any identification.  Mendez denied knowledge of any reason why a narcotics dog would alert on his suitcase.  At that point, the officers escorted Mendez off the airplane to identify his suitcase.  Mendez was placed under arrest after fourteen bundles of cocaine were discovered in the suitcase.  Id.

At trial, the district court found that Mendez was placed under custodial arrest without probable cause when he was escorted from the plane.  Id. at 129.  The district court noted that, with the exception of the dog alert, the factors considered by the officers were as consistent with innocent activity as illegal activity.  Id.

Reversing the suppression order, this court stated that "innocent behavior frequently will provide the basis for a showing of probable cause."  Id. at 129 (internal citation omitted).  The court concluded that "the district court erred by failing to realize that the factors the court considered innocent or marginal had a greater significance after the dog alerted on Mendez' suitcase."  Id.

Likewise, the combination of the dog alert and the factors previously noted in the analysis of the reasonable suspicion requirement gave Beall probable cause to seize Dale's money.  The district court erred by failing to realize that the factors it viewed as indicative of law-abiding activity took on a greater significance after the dog alerted on the locker.  See id.  The district court incorrectly suppressed the evidence from the DFW airport stop.

*B. The Search of Dale's Jeep*

The district court held that the search warrant obtained when the Jeep was impounded was fatally defective because it was too broad, thus permitting "the wholesale seizure of items that generally are not evidence of criminal activity."[3]  The search warrant authorized a search for "property described in said affidavit, to wit: any violation of the Texas Health and Safety Code Section 481."  The supporting affidavit stated that the Jeep was suspected of containing "a controlled substance in violation of the Texas Health and Safety Code, Chapter 481."  The affidavit detailed Dale's involvement in drug activity and the fact that two drug dogs had alerted to various parts of the vehicle.

---

[3]In an unusual analysis, the district court also found that the officers could not have had probable cause to search for drugs because no drugs were ultimately found in the Jeep. On the contrary, the officers had probable cause to believe that a controlled substance was in the Jeep as soon as the first dog alerted to the Jeep.  United States v. Dovali-Avila, 895 F.2d 206, 207 (5th Cir. 1990).

14

Finally, the affidavit stated that the officer believed that "said 1992 Jeep illegally contains a controlled substance."

The test for determining whether a search warrant is overbroad is whether the language will permit the executing officer to reasonably know what items to seize. United States v. Layne, 43 F.3d 127, 132 (5th Cir. 1994). The language of the affidavit can be considered along with the warrant in determining whether the warrant is too broad, if the warrant expressly refers to the affidavit. Layne, 43 F.3d at 132. In this case, the warrant referred to the affidavit and incorporated it by reference. Thus, the search warrant was sufficiently particular to permit the officers to search for and seize a controlled substance in the vehicle. The district court erred when it determined that the warrant was too broad.

As it turns out, the officers did not find a controlled substance when they searched the Jeep. Instead, the officers found and seized as evidence fabric softener sheets, small plastic bags, letters, phone bills, and photographs.

The plain view doctrine allows the use of evidence "when an officer lawfully in location by virtue of a warrant or some exception to the warrant requirement seizes an item having an incriminating character that is 'immediately apparent.'" United States v. Hill, 19 F.3d 984, 989 (5th Cir. 1994)(internal citation omitted). The officer need not know that the item discovered is evidence of a crime as long as there is "a

15

practical, nontechnical probability that incriminating evidence is involved." Id.  The determination that the evidence will assist in proving that a crime has been committed "must be viewed in the light of the observations, knowledge, and training of the law enforcement officers." United States v. Buchner, 7 F.3d 1149, 1154 (5th Cir. 1993).

A confidential informant had told Hawkins that Dale used fabric softener sheets to mask the scent of drugs.  Hawkins also knew that drug dealers commonly use ziplock bags to package smaller quantities of drugs.  The other evidence seized was relevant because it connected other members of the conspiracy. All of the evidence seized was properly seized under the plain view doctrine as evidence helpful in establishing Dale's involvement in illicit drug activity.  Thus, the district court erred in suppressing the evidence from the search of the Jeep.

### III. CONCLUSION

For the foregoing reasons, we VACATE the district court's order insofar as it suppressed the evidence seized from Dale at DFW and seized from Dale's Jeep and REMAND the case to the district court.